**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| BRIAN BAKER, on behalf of himself individually and on behalf of all others similarly situated, <br><br>      Plaintiff, <br><br>    v. <br><br> SLT Lending SPV, Inc. d/b/a Sur La Table, <br><br>      Defendant. | Case No. _____ |

## **CLASS ACTION COMPLAINT**

  Plaintiff Brian Baker ("Plaintiff") brings this Class Action Complaint ("Complaint") against Defendant SLT Lending SPV, Inc. d/b/a Sur La Table ("SLT Lending" or "Defendant") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to his own actions and his counsels' investigation, and upon information and belief as to all other matters, as follows:

## **NATURE OF THE ACTION**

  1.   This class action arises out of the recent cyberattack and data breach ("Data Breach") resulting from SLT Lending failure to implement reasonable and industry standard data security practices.

  2.   SLT Lending is a nationwide retailer that sells products including food, cookware, bakeware, knives, small appliances, and other kitchen tools.[1]

---

[1] https://www.surlatable.com/ (last accessed June 5, 2023)

3.      Plaintiff's and Class Members' sensitive personal information—which they entrusted to Defendant on the mutual understanding that Defendant would protect it against disclosure—was compromised and unlawfully accessed due to the Data Breach.

4.      SLT Lending collected and maintained certain personally identifiable information of Plaintiff and the putative Class Members (defined below), who are (or were) employees at SLT Lending.

5.      The Private Information compromised in the Data Breach included Plaintiff's and Class Members' full names, driver's license numbers or state identification numbers, ("personally identifiable information" or "PII") and medical and health insurance information, which is protected health information ("PHI", and collectively with PII, "Private Information") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

6.      The Private Information compromised in the Data Breach was exfiltrated by cyber-criminals and remains in the hands of those cyber-criminals who target Private Information for its value to identity thieves.

7.      As a result of the Data Breach, Plaintiff and potentially thousands of Class Members, suffered concrete injury in fact including, but not limited to: (i) fraudulent charges (as Plaintiff experienced to his debit card); (ii) lost or diminished value of their Private Information; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) invasion of privacy; (v) loss of benefit of the bargain; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so

long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

8.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect its employees' Private Information from a foreseeable and preventable cyber-attack.

9.      Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

10.      Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and security practices to safeguard Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

11.      Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct because the Private Information that Defendant collected and maintained is now in the hands of data thieves.

12.      Armed with the Private Information accessed in the Data Breach, data thieves have already engaged in identity theft and fraud (including the fraud suffered by Plaintiff described

below), and can in the future commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

13.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

14.     Plaintiff and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

15.     Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

16.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

17.     Plaintiff seeks remedies including, but not limited to, compensatory damages and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

## PARTIES

18.     Plaintiff Brian Baker is a resident and citizen of Houston, Texas. Mr. Baker is a former SLT Lending employee who worked there over ten years ago. As a condition of Plaintiff's employment at SLT Lending, he was required to provide his Private Information to Defendant.

19.     Plaintiff received the Notice Letter, directly from Defendant, via U.S. mail, dated May 24, 2023 (the "Notice Letter"). If Mr. Baker had known that Defendant would not adequately protect his Private Information, he would not have entrusted Defendant with his Private Information or allowed Defendant to maintain this sensitive Private Information.

20.     Defendant SLT Lending is a corporation duly formed and existing under the laws of the State of Delaware with a principal place of business at 8450 Broadway, Merrillville, Indiana 46410.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because many putative class members, including Plaintiff Baker, are citizens of a different state than Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

22.     This Court has personal jurisdiction over Defendant because it operates and maintains its principal place of business in this District and the computer systems implicated in this Data Breach are likely based in this District. Further, Defendant is authorized to and regularly conducts business in this District and makes decisions regarding corporate governance and

management of its businesses in this District, including decisions regarding the security measures to protect its employees' Private Information.

23.     Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because a substantial part of the events giving rise to this action occurred in this District, including decisions made by Defendant's governance and management personnel or inaction by those individuals that led to the Data Breach; Defendant's principal place of business is located in this district; Defendant maintains Class Members' Private Information in this District; and Defendant caused harm to Class Members residing in this District.

## STATEMENT OF FACTS

### *Defendant's Business*

24.     SLT Lending is a retailer that sells products including food, cookware, bakeware, knives, small appliances, and other kitchen tools.[2]

25.     Upon information and belief, in the course of collecting Private Information from employees, including Plaintiff, Defendant promised to provide confidentiality and adequate security for employee data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

26.     Indeed, Defendant's Privacy Policy provides that: "[w]e have implemented measures designed to secure your Personal Information from accidental loss and from unauthorized access, use, alteration, and disclosure. All information you provide to us is stored on our secure servers behind firewalls. Any payment transactions will be encrypted using SSL technology."[3]

---

[2] https://www.surlatable.com/ (last accessed June 5, 2023)
[3] https://www.surlatable.com/privacy-policy.html (last accessed June 5, 2023)

27.     Even more, the Privacy Policy demonstrates Defendant's awareness of the foreseeability of a cyberattack, like the one it experienced: "[u]nfortunately, the transmission of information via the internet is not completely secure. Although we do our best to protect your Personal Information, we cannot guarantee the security of your Personal Information transmitted to our Website."[4]

28.     Plaintiff and the Class Members, as former and current employees of Defendant, relied on these promises and on this sophisticated business entity to keep their sensitive Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Employees, in general, demand security to safeguard their Private Information, especially when their health information, medical information, and other sensitive Private Information is involved.

29.     In the course of their employment relationship, employees, including Plaintiff and Class Members, provided Defendant with at least the following Private Information:

    a.     names;

    b.     driver's license numbers or state identification numbers;

    c.     medical and/or health information.

30.     Defendant had a duty to adopt reasonable measures to protect Plaintiff's and Class Members' Private Information from involuntary disclosure to third parties.

31.     In the untitled letter (the "Notice Letter") sent to Plaintiff and Class Members, Defendant asserts that—on an unspecified date—SLT Lending "identified unusual activity in our network that caused certain devices to become unavailable."[5] In response, Defendant "immediately

---

[4] *Id.*
[5] The "Notice Letter". A sample copy is available at https://apps.web.maine.gov/online/aeviewer/ME/40/9267a066-024b-41de-a5f7-d871fe00cd97.shtml (last accessed June 5, 2023)

implemented our incident response plan, took steps to contain the activity, and launched an investigation."[6] As a result of that investigation, Defendant concluded—on May 11, 2023—that "an unauthorized actor accessed certain folders on our devices between March 15, 2023, and March 25, 2023[,]" including Plaintiff's and Class Members' names, driver's license numbers or state identification numbers, and medical or health information.

32. Omitted from the Notice Letter were the details of the date that Defendant detected the Data Breach, the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

33. Upon information and belief, the cyberattack was targeted at Defendant, due to its status as an employer that collects, creates, and maintains Private Information on its computer networks and/or systems.

34. Upon information and belief, Plaintiff's and Class Members' Private Information was, in fact, acquired by unauthorized parties in the Data Breach.

35. The files, containing Plaintiff's and Class Members' Private Information and stolen from Defendant, included the following: names, driver's license numbers, and medical and/or health information.[7]

36. Because of this targeted cyberattack, data thieves were able to gain access to and obtain data from Defendant that included the Private Information of Plaintiff and Class Members.

---

[6] *Id.*
[7] *Id.*

37.     As evidenced by the Data Breach's occurrence, the Private Information contained in Defendant's network was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

38.     Plaintiff's Private Information was accessed and stolen in the Data Breach and Plaintiff believes his stolen Private Information is currently available for sale on the dark web because that is the *modus operandi* of cybercriminals.

39.     Due to the actual and imminent risk of identity theft as a result of the Data Breach, Plaintiff and Class Members must, as Defendant's Notice Letter encourages them to do, monitor their financial accounts for many years to mitigate the risk of identity theft.[8]

40.     In the Notice Letter, Defendant makes an offer of 12 months of identity monitoring services. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, medical and financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' Private Information.

41.     That Defendant is encouraging its current and former employees to enroll in credit monitoring and identity theft restoration services is an acknowledgment that the impacted individuals' Private Information *was* accessed, thereby subjecting Plaintiff and Class Members to a substantial and imminent threat of fraud and identity theft.

42.     Defendant had obligations created by the FTC Act, contract, state and federal law, common law, and industry standards to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

---

[8] *Id.*

*Data Breaches Are Preventable*

43.     Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

44.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

45.     The unencrypted Private Information of Class Members may end up for sale to identity thieves on the dark web, if it has not already, or it could simply fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

46.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[9]

47.     To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF),

---

[9] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Oct. 17, 2022).

Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[10]

---

[10] *Id.* at 3-4.

48.     To prevent and detect cyber-attacks or ransomware attacks UBMC could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[11]

---

[11] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Nov. 11, 2021).

49.     Given that Defendant was storing the Private Information of its current and former employees, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

50.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of tens of thousands of current and former employees, including Plaintiff and Class Members.

### *Defendant Acquires, Collects, And Stores Employees' Private Information*

51.     Defendant acquires, collects, and stores a massive amount of Private Information on its employees, former employees and other personnel.

52.     As a condition of employment, or as a condition of receiving certain benefits, Defendant requires that employees, former employees and other personnel entrust it with highly sensitive personal information.

53.     By obtaining, collecting, and using Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

54.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

55.     Plaintiff and the Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

***Defendant Knew or Should Have Known of the Risk Because Employers***
***In Possession Of PII and PHI Are Particularly Suspectable To Cyber Attacks***

56. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store Private Information, like Defendant, preceding the date of the breach.

57. Data breaches, including those perpetrated against employers that store Private Information in their systems, have become widespread.

58. In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[12]

59. The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[13]

60. Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[14]

61. In light of recent high profile data breaches at industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records,

---

[12] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6.
[13] *Id*.
[14] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (last accessed Oct. 17, 2022).

June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

62. Defendant knew and understood unprotected or exposed Private Information in the custody of employers, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that Private Information through unauthorized access.

63. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

64. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

65. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

66. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

67. As a business in custody of current and former employees' Private Information, Defendant knew, or should have known, the importance of safeguarding Private Information

entrusted to them by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

### *Value Of Private Information*

68.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[15] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[16]

69.     The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[17]

70.     For example, Personal Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[18]

---

[15] 17 C.F.R. § 248.201 (2013).

[16] *Id.*

[17] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 17, 2022).

[18] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 17, 2022).

71.     Criminals can also purchase access to entire company data breaches from $900 to $4,500.[19]

72.     Driver's license numbers, which were compromised in the Data Breach, are incredibly valuable.  "Hackers harvest license numbers because they're a very valuable piece of information.

73.     A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web.  On its own, a forged license can sell for around $200."[20]

74.     According to national credit bureau Experian:

A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.

75.     According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[21] However, this is not the case. As cybersecurity experts point out:

"It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID

---

[19] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Oct. 217, 2022).

[20] https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3e4755c38658 (last visited on Feb. 21, 2023).

[21] https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/ (last visited on Feb. 21, 2023).

verification, or use the information to craft curated social engineering phishing attacks."[22]

76.     Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[23]

77.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—name and medical information.

78.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[24]

79.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

80.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

---

[22] *Id.*

[23] *How Identity Thieves Took My Wife for a Ride,* NY Times, April 27, 2021, available at: https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last visited on Feb. 21, 2023).
[24] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Oct. 17, 2022).

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[25]

### Defendant Fails To Comply With FTC Guidelines

81.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

82.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal employee information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[26]

83.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[27]

84.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require

---

[25] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 17, 2022).
[26] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Oct. 17, 2022).
[27] *Id.*

complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

85.     The FTC has brought enforcement actions against employers for failing to protect employee data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

86.     These FTC enforcement actions include actions against employers over the compromised Private Information of its employees, like Defendant here.

87.     Defendant failed to properly implement basic data security practices.

88.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to employees' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

89.     Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of its employees. Defendant was also aware of the significant repercussions that would result from its failure to do so.

***Defendant Fails To Comply With Industry Standards***

90.     As noted above, experts studying cyber security routinely identify entities in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

91.   Several best practices have been identified that a minimum should be implemented by employers in possession of Private Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

92.   Other best cybersecurity practices that are standard for employers include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

93.   Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

94.   These foregoing frameworks are existing and applicable industry standards for an employer's obligations to provide adequate data security for its employees. Upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

## COMMON INJURIES & DAMAGES

95.     As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their Private Information; and (e) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

### *The Data Breach Increases Victims' Risk Of Identity Theft*

96.     Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

97.     The unencrypted Private Information of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted Private Information may fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. As a result of the Data Breach, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

98.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information.

Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

99.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

100.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victims.

101.    One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[28]

---

[28] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/ (last visited on May 26, 2023).

102.    With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

103.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

104.    The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like phone numbers and emails) of Plaintiff and the other Class Members.

105.    Thus, even if certain information (such as emails or telephone numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

106.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

***Loss Of Time To Mitigate Risk Of Identity Theft And Fraud***

107.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a

victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

108.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Defendant's Notice Letter encourages them to do, monitor their financial accounts for many years to mitigate the risk of identity theft.

109.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as enrolling in the credit monitoring and identity theft insurance offered by defendant, contacting credit bureaus to place freezes on their accounts, contacting banks regarding fraudulent charges, and contacting the Social Security Administration to further secure their accounts.

110.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[29]

111.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[30]

---

[29] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[30] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited July 7, 2022).

112.     A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[31]



113.     And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[32]

---

[31] Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at:
https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited Sep 13, 2022).
[32] See "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Sep. 13, 2022) ("GAO Report").

### *Diminution Value Of PII and PHI*

114.    PII and PHI are valuable property rights.[33] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

115.    For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals and other entities in custody of PHI often purchase Private Information on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed Private Information to adjust their insureds' medical insurance premiums.

116.    An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[34]

117.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[35,36]

118.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[37]

---

[33] *See, e.g.,* Brian T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[34] https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[35] https://datacoup.com/
[36] https://digi.me/what-is-digime/
[37] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

119.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[38]

120.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

121.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., names, medical information, and health information.

122.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

123.    The fraudulent activity resulting from the Data Breach may not come to light for years.

124.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached,

---

[38] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Sep. 13, 2022).

including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

125.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to potentially tens of thousands of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

126.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

### *FUTURE COST OF CREDIT AND IDENTITY THEFT MONITORING IS REASONABLE AND NECESSARY*

127.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes –*e.g.,* opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

128.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

129.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts, because the information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as name and medical information).

130.    Consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

131.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

### *Loss Of The Benefit Of The Bargain*

132.    Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When submitting Private Information to Defendant under certain terms through a job application and/or onboarding paperwork, Plaintiff and other reasonable employees understood and expected that Defendant would properly safeguard and protect their Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received an employment position of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

### **PLAINTIFF BAKER'S EXPERIENCE**

133.    More than ten years ago, Plaintiff Baker was employed at SLT Lending.

134.    In the course of enrolling in employment with Defendant and as a condition of employment, he was required to supply Defendant with his Private Information.

135.    Plaintiff Baker is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

136.    At the time of the Data Breach, between March 15, 2023 and March 25, 2023, Defendant retained Plaintiff's Private Information in its despite no longer maintaining an employment relationship with Plaintiff for *more than a decade.*

137.    Plaintiff Baker received the Notice Letter, by U.S. mail, directly from Defendant, dated May 24, 2023. According to the Notice Letter, Plaintiff's Private Information was improperly accessed and obtained by unauthorized third parties, including his full name, driver's license number or state identification number, and medical and/or health information.

138.    Upon receiving the Notice Letter form Defendant, Plaintiff Baker has spent significant time dealing with the consequences of the Data Breach including enrolling in the credit monitoring and identity theft insurance offered by defendant, contacting credit bureaus to place freezes on their accounts, contacting banks regarding fraudulent charges, and contacting the Social Security Administration to further secure their accounts. Plaintiff has spent significant time—at least 7 to 8 hours, at this time—in response to the Data Breach. This is valuable time that is forever lost and cannot be recaptured.

139.    Subsequent to and as a result of the Data Breach, Plaintiff Baker has suffered numerous, substantial injuries including, but not limited to: (i) two fraudulent charges, totaling approximately $900, to his Wells Fargo debit card in March 2023; (ii) an increase in spam

calls, texts, and/or emails; (iii) lost or diminished value of his Private Information; (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (v) invasion of privacy; and (vi) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

140.    Plaintiff Baker additionally suffered actual injury and damages as a result of the Data Breach. Implied in his employment contract with Defendant was the requirement that it adequately safeguard his Private Information and that it would delete or destroy his Private Information after Defendant was no longer required to retain it. Plaintiff Baker would not have worked for Defendant had Defendant disclosed that it lacked data security practices adequate to safeguard Private Information.

141.    Plaintiff Baker further suffered actual injury in the form of damages and diminution in the value of his Private Information —a form of intangible property that he entrusted to Defendant for the purpose of employment, which was compromised by the Data Breach.

142.    Plaintiff Baker also suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy, especially his medical and health information, being in the hands of criminals.

143.    Plaintiff Baker has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his stolen Private Information being placed in the hands of unauthorized third parties and possibly criminals.

144.    Plaintiff Baker has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

145.    Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated.

146.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All persons whose Private Information was maintained on Defendant's computer systems that were compromised in the Data Breach announced by Defendant in May 2023 (the "Class").

147.    Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

148.    Plaintiff hereby reserves the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

149.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, according to the report submitted to the Maine Attorney General, the Class consists at least 40,000 persons whose data was compromised in Data Breach.[39]

---

[39] *See* https://apps.web.maine.gov/online/aeviewer/ME/40/9267a066-024b-41de-a5f7-d871fe00cd97.shtml (last accessed June 5, 2023)

150.   <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.   Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.   Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.   Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.   Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.   Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g.   Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h.   Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i.   Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.   Whether Defendant's conduct was negligent;

      k.     Whether Defendant breached implied contracts for adequate data security with Plaintiff and Class Members;

      l.     Whether Defendant was unjustly enriched by retention of the monetary benefits conferred on it by Plaintiff and Class Members;

      m.     Whether Defendant failed to provide notice of the Data Breach in a timely manner; and,

      n.     Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

151.    <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach.

152.    <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

153.    <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

154.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class

Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

155.    Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

156.    Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

b.    Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

c.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

d.    Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

e.      Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

157.    Finally, all Members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent Notice of the Data Breach by Defendant.

## <u>COUNT I – Negligence</u>
**(By Plaintiff on behalf of the Class)**

158.    Plaintiff restates and realleges all proceeding allegations above and hereafter as if fully set forth herein.

159.    This count is brought on behalf of all Class Members.

160.    Defendant required Plaintiff and Class Members to submit non-public Private Information as a condition of employment or as a condition of receiving employee benefits.

161.    Plaintiff and the Class Members entrusted their Private Information to Defendant with the understanding that Defendant would safeguard their information and delete it once the employment relationship terminated.

162.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

163.     Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

164.     Section 5 of the FTC Act, as interpreted and enforced by the FTC, prohibits the unfair act or practice by businesses, such as Defendant,[40] of failing to use reasonable measures to protect Private Information. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the members of the Class's sensitive Private Information.

165.     Plaintiff and members of the Class are within the class of persons that the FTC Act was intended to protect.

166.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against employers, which, as a result of failures to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm to its employees as that suffered by Plaintiff and members of the Class.

167.     Defendant's conduct constitutes negligence *per se* because it was in violation of Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards.

168.     Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored, and the foreseeable consequences of the Data Breach for companies of Defendant's magnitude, including, specifically, the immense

---

[40] https://www.ftc.gov/news-events/news/press-releases/2011/05/ftc-settles-charges-against-two-companies-allegedly-failed-protect-sensitive-employee-data

damages that would result to Plaintiff and Members of the Class due to the valuable nature of the Private Information at issue in this case—including their health and medical information.

169.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

170.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

   a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

   b.    Failing to adequately monitor the security of their networks and systems;

   c.    Failing to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

   d.    Allowing unauthorized access to Class Members' Private Information; and,

   e.    Failing to detect in a timely manner that Class Members' Private Information had been compromised.

171.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the industry.

172.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

173.     There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the Private Information and the harm suffered, or risk of imminent harm suffered by Plaintiff and the Class.

174.     As a result of Defendant's negligence, Plaintiff and the Class Members have suffered and will continue to suffer damages and injury including, but not limited to: (i) Plaintiff experiencing fraudulent charges to his debit card; (ii) lost or diminished value of their Private Information; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) invasion of privacy; (v) loss of benefit of the bargain; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

175.     Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

176.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to The Class.

## COUNT II – Negligence *Per Se*
### (By Plaintiff on behalf of the Class)

177.     Plaintiff restates and realleges all proceeding allegations above and hereafter as if fully set forth herein.

178.     This count is brought on behalf of all Class Members.

179.   Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies, such as Defendant, of failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendant's duty.

180.   The Indiana Disclosure of Security Breach Act ("IDSBA") requires that entities in possession of Private Information belonging to Indiana residents that was or may have been accessed by unauthorized persons disclose the data breach without unreasonable delay. *See* In. Stat. § 24-4.9- 1, *et seq.*

181.   Defendant violated Section 5 of the FTC Act and IDSBA by failing to use reasonable measures to protect Private Information and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

182.   Defendant's violation of Section 5 of the FTC Act and the IDSBA constitutes negligence *per se.*

183.   Class Members are consumers within the class of persons Section 5 of the FTC Act and the IDSBA were intended to protect.

184.   Moreover, the harm that has occurred is the type of harm the FTC Act and the IDSBA were intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

185.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

186.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

187.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) Plaintiff experiencing fraudulent charges to his debit card; (ii) lost or diminished value of their Private Information; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) invasion of privacy; (v) loss of benefit of the bargain; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

188.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

189.     Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

190.     Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

191.     Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

192.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT III – Breach of Implied Contract
### (By Plaintiff on behalf of the Class)

193.     Plaintiff restates and realleges all proceeding allegations above and hereafter as if fully set forth herein.

194.     This count is brought on behalf of all Class Members.

195.     Plaintiff and Class Members were required to provide their Private Information to Defendant as a condition of their employment with Defendant.

196.     Plaintiff and Class Members provided their labor and their Private Information to Defendant in exchange for (among other things) Defendant's promise to protect their Private Information from unauthorized disclosure and to delete it once it was no longer necessary to maintain the Private Information for employment purposes. Defendant additionally promulgated,

adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

197.     On information and belief, Defendant further promised to and represented it would comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

198.     Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the Private Information only under conditions that kept such information secure and confidential.

199.     When Plaintiff and Class Members provided their Private Information to Defendant as a condition of their employment or employee beneficiary status, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

200.     Defendant required Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

201.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

202.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

203.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

204.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

205.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

206.    As a direct and proximate result of Defendant's breaches of the implied contracts, Class Members sustained damages as alleged herein.

207.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

208.    Plaintiff and Class Members are also entitled to nominal damages for the breach of implied contract.

209.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to The Class.

### Count IV – Unjust Enrichment
**(By Plaintiff on behalf of the Class)**

210.    Plaintiff restates and realleges all proceeding allegations above and hereafter as if fully set forth herein.

211.    This count is brought on behalf of all Class Members.

212.    This count is pleaded in the alternative to Plaintiff's breach of contract claim above (Count III).

213.    Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of their labor and by providing their valuable Private Information to Defendant.

214.    Plaintiff and Class Members provided Defendant their labor and Private Information on the understanding that Defendant would pay for the administrative costs of reasonable data privacy and security practices and procedures from the revenue it derived therefrom. In exchange, Plaintiff and Class members should have received adequate protection and data security for such Private Information held by Defendant.

215.    Defendant benefited from receiving Plaintiff's and Class Members' labor and from receiving their Private Information through its ability to retain and use that information for its own benefit. Defendant understood and accepted this benefit.

216.    Defendant knew Plaintiff and Class members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

217.    Because all Private Information provided by Plaintiff and Class Members was similarly at risk from a foreseeable and targeted data breach, Defendant's obligation to safeguard the Private Information it collected from its employees was inherent to the employment relationship.

218.    Defendant also understood and appreciated that Plaintiff's and Class Members' Private Information was private and confidential, and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

219.    Defendant failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiff and Class Members.

220.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff' and Class Members' Private Information.

221.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead made calculated decisions to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

222.    Under the principles of equity and good conscience, Defendant should not be permitted to retain money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures mandated by industry standards.

223.    Defendant's enrichment at the expense of Plaintiff and Class Members is and was unjust.

224.    Defendant acquired the monetary benefit and Private Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

225.    If Plaintiff and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

226.    Plaintiff and Class Members have no adequate remedy at law.

227.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury as described herein.

228.    Plaintiff and the Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.    For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Class, pursuant to Federal Rule of Civil Procedure 23;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to  issue prompt, complete and accurate disclosures to Plaintiff and Class    Members;

C.    For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.     requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.     requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

v.      prohibiting Defendant from maintaining the Private Information of Plaintiff and Class Members on a cloud-based database;

vi.     requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.     requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

49

viii.   requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix.   requiring Defendant to conduct regular database scanning and securing checks;

x.   requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xi.   requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.   requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.   requiring Defendant to meaningfully educate The Class about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi.   for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.   For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

E.   For an award of punitive damages, as allowable by law;

F.   For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

G.      Pre- and post-judgment interest on any amounts awarded; and

H.      Such other and further relief as this court may deem just and proper.


Dated: June 12, 2023                    Respectfully submitted,

                                        /s/  Gary M. Klinger
                                        Gary M. Klinger
                                        **MILBERG COLEMAN BRYSON**
                                        **PHILLIPS GROSSMAN PLLC**
                                        227 W. Monroe Street, Suite 2100
                                        Chicago, IL 60606
                                        Phone: (866) 252-0878
                                        gklinger@milberg.com

                                        *Counsel for Plaintiff and*
                                        *the Proposed Class*